**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**M. A. LUNDY ASSOCIATES et al., Defendants.**

**Civ. A. No. 4999.**

United States District Court, D. Rhode Island.

July 2, 1973.

Willis H. Riccio, Regional Counsel, S. E. C., Boston, Mass., for plaintiff.

J. Owen Todd, of Hale and Dorr, Robert W. Mahoney, Boston, Mass., for Kathryn A. Allard.

Michael A. Gaffin, of Topkins, Gaffin, Elliott S. Topkins, Siegel & Krattenmaker, Boston, Mass., for Maurice A. Lundy and M. A. Lundy Associates and Scotch Whisky, Ltd.

Alan Z. Lefkowitz, of Kaplan, Finkel, Lefkowitz, Roth & Ostrow, Pittsburgh, Pa., Abraham Belilove, Providence, R. I., for Florida Development Properties, Inc.

OPINION

DAY, District Judge.

In this action the plaintiff seeks injunctive relief, both preliminary and permanent, against the five defendants named in its complaint, based upon certain alleged violations by them of the Securities Act of 1933, 15 U.S.C. § 77a et seq. and of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.

In Count I of its complaint the plaintiff alleges that the defendants M. A. Lundy Associates, a sole proprietorship owned by the defendant Maurice A. Lundy, and the defendants Maurice A. Lundy, Kathryn A. Allard and Florida Development Properties, Inc. have violated and are violating certain provisions of said Securities Laws in connection with the offering and sales of certificates of beneficial ownership in certain Rhode Island Trusts.

In Count II of its complaint the plaintiff alleges that the defendants Maurice A. Lundy and Scotch Whisky, Ltd., a Rhode Island corporation, incorporated on January 3, 1972, have violated and are violating said Securities Laws in connection with their offering and selling of scotch whisky warehouse receipts.

Jurisdiction of this Court is invoked under the provisions of Section 22(a) of the Securities Act of 1933, as amended, 15 U.S.C. § 77v(a) and Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa.

At the conclusion of a hearing upon the plaintiff's prayer for a preliminary injunction enjoining the defendants from further violations pending the trial of this action on its merits, I reserved decision pending the filing of memoranda by counsel for the parties.

I. *Certificates of Beneficial Interest In the Allard Trusts*

The evidence adduced at said hearing establishes that on some uncertain date prior to March 1, 1971, the defendant Maurice A. Lundy (hereinafter referred to as Lundy) was approached by a representative of the defendant Florida Development Properties, Inc. (hereinafter referred to as FDP), a Delaware corporation, engaged in developing land in Florida. He requested Lundy's assistance in raising money in Rhode Island

for FDP, to be used to finance the developing of real estate in Florida. Lundy and said representative later conferred with Lundy's attorney and sought his advice thereon. Shortly thereafter, apparently acting upon his advice, Lundy caused four Rhode Island trusts to be created with the defendant Kathryn A. Allard (hereinafter Allard), an employee of Lundy, as the trustee thereof.

Promptly after their creation and no later than April 15, 1971, Lundy caused advertisements by M. A. Lundy Associates (hereafter Associates) to be inserted in The Providence Journal, a newspaper of state-wide circulation in the State of Rhode Island, and other newspapers in said state for a period of one year, offering for sale to Rhode Island residents certificates of beneficial interest in said trusts, bearing interest at the rate of nine (9) per cent, payable every three (3) months, with a maturity of nine (9) months, and a minimum purchase price of five thousand dollars ($5,000). In response to inquiries concerning said advertisements, Lundy mailed letters on Associates stationery to inquiring persons describing certain aspects of the investment. When a member of the public decided to purchase a certificate, his check was drawn payable to M. A. Lundy Associates, and receipts were given by Lundy under that name. Following payment to Lundy, the defendant Allard mailed said certificate of beneficial interest to the investor.

In fact, each certificate of beneficial interest provided that the beneficiary-investor "shall receive from said Trust Estate, when, as, and if available interest at the rate of 9% per annum payable every three months for nine months." The monies so collected were initially deposited in a bank account standing in the name of Associates. These monies were then loaned by Allard as the trustee of said trusts to FDP which thereupon executed promissory notes for the amounts so loaned to it payable to her as trustee. These notes, payable nine months from the date thereof, provided for the payment of interest at the rate of fifteen (15) per cent on the amount thereof. As security for the payment of said notes FDP collaterally assigned to Allard certain mortgages and delivered them to Commonwealth Land Title Company, of North Miami, Florida, with which she maintained an escrow account.[1] Payment of said loans was also guaranteed by Apollo Industries, Inc., a corporation, of which FDP was a subsidiary. Under the terms of said loan agreement, Allard was to be compensated for her services as trustee and Lundy was to receive a finder's fee of ten (10) per cent of the amount received from investors on said certificates of beneficial interest.

Lundy testified that the sale of said certificates of beneficial interest in said Allard trusts ceased in April, 1972, and that no sales thereof had been made

---

[1]. This arrangement is set forth in the loan agreement that was executed simultaneously with said notes. Annexed to said loan agreement was a list of real estate mortgages then held by FDP. Under the terms of said loan agreement FDP assigned these mortgages as collateral to Allard as Trustee. It was provided in said agreement that all of said assignments were not to be recorded at that time. Under its terms Allard was to loan the sum of $50,000 to FDP and thereupon FDP would select certain of said mortgages of a gross amount not less than the amount loaned to it. The mortgages then selected by FDP from said list were subject to Allard's approval, and then the assignments of the mortgages selected by her would be recorded. As future loans were made by her to FDP the procedure would be repeated.

In an addendum to said loan agreement it was stipulated:

"1. That the mortgages described in Schedule 'A' attached to the Agreement do not all represent good and valid first mortgages on this date.

2. That as a condition precedent to the funding of the monies expected to be loaned, the Borrower shall present in a form acceptable to the Lender, its affidavit by appropriate officer, stating that the mortgages are good and valid first mortgages."

since that time. He also testified that he had learned that representatives of the Securities and Exchange Commission were conducting an investigation of said Allard trusts during the summer and autumn of 1971.

A. *Alleged Violation of Registration Requirement*

The plaintiff charges that the defendants have violated and are violating the registration provisions of Section 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (c). Those sections provide that it shall be unlawful for any person to use any means or instruments of interstate commerce or the mails to sell or offer for sale any non-exempt security unless a registration statement thereof has been filed with said Securities and Exchange Commission. Defendants Lundy, Allard and Associates admit that the mails were used to consummate the sales of said certificates of beneficial interest. They also admit that no registration statement was ever filed with said Commission. Additionally, said defendants concede that said certificates of beneficial interest are securities within the meaning of Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1).

■ They contend that said certificates of beneficial interest are exempted from said registration requirement by the provisions of Section 3(a)(3) of said Act, 15 U.S.C. § 77c(a)(3). Said section exempts from registration:

"Any note, draft, bill of exchange or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof, the maturity of which is likewise limited. . . ."

It is well settled that exemptions from the Securities Laws are to be strictly construed and that a person claiming such an exemption bears the burden of proof to establish his entitlement thereto. S.E.C. v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); Capital Funds, Inc. v. S.E.C., 348 F.2d 582, 586 (8th Cir. 1965); S.E.C. v. Culpepper, 270 F.2d 241, 246 (2d Cir. 1959); S.E.C. v. Sunbeam Gold Mines Co., 95 F.2d 699 (9th Cir. 1938); S.E.C. v. McDonald Investment Co., 343 F.Supp. 343, 346 (D.Minn.1972).

■ In my opinion a certificate of beneficial interest of the type involved herein cannot be properly classified as a "note, draft, bill of exchange or banker's acceptance" within the provisions of said Section 3(a)(3) of said Act and thereby qualify for said exemption from registration. See Securities Act Release No. 4412, 26 Fed.Reg. 9158 (September 1961).

In said Release No. 4412 the Securities and Exchange Commission stated:

"The legislative history of the Act makes it clear that said section 3(a)(3) applies only to *prime quality negotiable commercial paper of a type not ordinarily purchased by the general public,* that is, paper issued to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks. Thus, the Senate Report on the Securities Act of 1933 explained the purpose of section 3(a)(3) as follows:

["]Notes, drafts, bills of exchange and bankers' acceptances which are commercial paper and arise out of current commercial, agricultural, or industrial transactions, and *which are not intended to be* marketed to the public are exempted . . . It is not intended under the bill to require the registration of short-term commercial paper which, as is the usual practice, is made to mature in a few months and *ordinarily is not advertised for sale to the general public.*["] (S. Report No. 47 on S. 875, 73rd Cong., 1st Sess. (1933) pp. 3–4. (Emphasis added)

**232**

In United States v. Hill, 298 F.Supp. 1221 (D.Conn.1969), the Court noted the paucity of administrative and judicial interpretation of said Section 3(a)(3) and adopted the interpretation thereof set forth in said Release and in said section's legislative history. To the same effect see Anderson v. Francis I. duPont & Co., 291 F.Supp. 705 (D.C.Minn.1968). The certificates of beneficial interest in said Allard trusts obviously cannot be considered "as prime quality negotiable commercial paper of a type not ordinarily purchased by the general public" or "of a type eligible for discounting by Federal Reserve Banks" or "of a type which are not intended to be marketed to the public." They were issued for sale to the general public and were offered for sale to the general public in said newspaper advertisements. Clearly they were not exempt from registration under the provisions of said Section 3(a)(3). Their sale without prior registration was in violation of the provisions of said Section 5(a) and (c) of said Securities Act of 1933, 15 U.S.C. § 77e(a) and (c).

■ The plaintiff, as hereinbefore set forth, seeks a preliminary injunction enjoining all of said defendants from *selling or offering to sell to the general* public any non-exempt securities without first complying with the provisions of said Section 5 of said Securities Act of 1933. The defendant FDP contends that it did not participate in any violation of said Act, and that a preliminary injunction *should not issue against it.* The plaintiff contends that it had such knowledge of the Lundy and Allard offerings and sales as to justify the injunctive relief sought against it. In my opinion the evidence does not warrant such a conclusion. No evidence was *presented which establishes that FDP* was involved in the offering or advertising of these certificates for sale or that it had knowledge of the manner or method of such sales. In the absence of a showing that it participated in such offerings and sales, I am not disposed to grant injunctive relief against it. Ac-

cordingly, the plaintiff's prayer for a preliminary injunction against FDP must be and it is denied.

■ The evidence clearly establishes that the remaining defendants, Lundy, Allard, and Associates have been directly involved in the offering and sale of said certificates. It is well settled that a prayer for injunctive relief under Section 20(b) of said Securities Act of 1933, 15 U.S.C. § 77t(b) is addressed to the sound discretion of the District Court. S.E.C. v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972); S.E.C. v. Texas Gulf Sulphur Co., 446 F.2d 1301–1307 (2d Cir. 1971), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971); S.E.C. v. Culpepper, supra, 270 F.2d at 241.

■ The test to be applied is whether a defendant's past conduct indicates, under all circumstances, that there is a reasonable likelihood of further violations in the future unless restrained by the Court. Goshen Mfg. Co. v. Myers Mfg. Co., 242 U.S. 202, 37 S.Ct. 105, 61 L.Ed. 248 (1916); S.E.C. v. Manor Nursing Centers, Inc., supra; S.E.C. v. Northeastern Financial Corp., 268 F. Supp. 412 (D.C.N.J.1967). It is generally recognized that a showing of past violations gives rise to the inference that there is a reasonable likelihood of future violations. S.E.C. v. Keller Corporation, 323 F.2d 397 (7th Cir. 1963); S.E.C. v. Culpepper, supra.

■ The fact that a defendant has *terminated his illegal activity does not* operate to render a motion for a preliminary injunction moot or operate as a bar to such relief. S.E.C. v. Culpepper, supra; S.E.C. v. Harwyn Industries Corp., 326 F.Supp. 943 (S.D.N.Y.1971). This is especially true when, as here, the *cessation occurs in the face of a known in-*vestigation by representatives of the S. E.C., and possible legal action. S.E.C. v. Torr, 87 F.2d 446 (2d Cir. 1937); S.E. C. v. Griffin, 296 F.Supp. 883 (S.D. Miss.1968); S.E.C. v. Broadwall Securities, Inc., 240 F.Supp. 962 (S.D.N.Y. 1965).

■ Said defendants emphasize the fact that they commenced their activities only after consultation with an attorney and in reliance upon his advice. A defendant's reliance upon the advice of his counsel is, or course, a factor to be considered by the Court in ruling upon an application for a preliminary injunction. It is not, however, determinative of the issue. S.E.C. v. Manor Nursing Centers, Inc., supra; S.E.C. v. Harwyn Industries Corp., supra. In stressing their reliance upon the advice of counsel, the defendants rely upon the holding of the Court in S.E.C. v. Harwyn, supra. The factual situation in that case was completely distinguishable from that present in the instant case. Here there was no substantive basis to support the advice allegedly relied upon. Counsel's letter to the defendant Lundy indicated that his advice to the defendants did not constitute a "formal opinion" and that his conclusion that the certificates of beneficial interest were "probably" exempt was based simply upon the fact that "they were debt obligations of only 9 months duration". Additionally, it is to be noted that the defendants did not seek an opinion from the Commission as to whether said certificates were exempt from registration, nor did their attorney. And their activities were terminated only after a substantial lapse of time after they learned that those activities were being investigated by said Commission.

■■ Said defendants ask the Court to consider seriously the fact that their businesses and reputations will be injured by the issuance of a preliminary injunction. While this is a factor to be recognized, such possibility does not of itself render injunctive relief inappropriate or unjust when there is a reasonable likelihood of recurrent violations by the defendants. Defendants' past unlawful activities, which continued long after they were aware that they were being investigated, coupled with the fact that some of said renewable certificates are still outstanding give rise to "a reasonable expectation" that the defendants will thwart the policy of the Act by engaging in the activities proscribed thereby. Cf. S.E.C. v. Culpepper, supra.

I find and conclude that the plaintiff has made a "proper showing" as required by Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b) and has established by a fair preponderance of the evidence and the reasonable inferences to be drawn from it that there does exist a reasonable likelihood of further violations of said Act by these defendants. Accordingly, a preliminary injunction will issue against the defendants Lundy, Allard, and Associates enjoining and prohibiting them from offering for sale or selling any non-exempt securities without full compliance with the registration requirements of Section 5(a) and (c) of said Securities Act of 1933, 15 U.S.C. § 77e(a) and (c).

## B. Alleged Violation of Anti-Fraud Provisions

The plaintiff also seeks a preliminary injunction enjoining the defendants [2] from further violation of Section 17(a) of said Securities Act of 1933, 15 U.S.C. § 77q(a)[3] and Section 10(b) of said Se-

---

2. As noted above, the defendant FDP has not been shown to have participated, directly or indirectly in the offering and sale of said certificates of beneficial interest. Accordingly, the word "defendants" will hereinafter refer only to the defendants Lundy, Allard, and Associates.

3. Said Section 17(a) of the Securities Act of 1933 provides in pertinent part:
 (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
 (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or

curities Exchange Act of 1934, 15 U.S.C. § 78j(b) [4] and Rule 10b–5 [5] promulgated thereunder.

Said sections of said Acts and said Rule 10b–5 are obviously designed to protect the public from deceitful or misleading statements or omissions in connection with the purchase or sale of securities. Plaintiff contends that the defendants have violated said Acts and said Rule and that injunctive relief is required to protect the public against further violations thereof by the defendants. Said Acts and Rule impose upon persons engaged in the sale of securities a strict duty of full disclosure and the failure to disclose any material fact in relation thereto constitutes a violation thereof. A material fact has been defined as any fact to which "a reasonable man would attach importance [to the fact not disclosed] in determining his choice of action in the transaction in question". Rogen v. Ilikon Corporation, 361 F.2d 260 (1st Cir. 1966). See also, S.E.C. v. Great American Industries, Inc., 407 F.2d 453 (2d Cir. 1968), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969); S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied 404 U.S. 1005, 92 S. Ct. 561, 30 L.Ed.2d 558 (1971); List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965), cert. denied sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L. Ed.2d 60 (1965). Proof of scienter or intent to defraud is not required to show violations justifying preliminary injunctive relief under said Acts. See S.E.C. v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); S.E.C. v. Pearson, 426 F.2d 1339 (10th Cir. 1970); S.E.C. v. Van Horn, 371 F.2d 181 (7th Cir. 1966). Similarly, the Commission is not required to prove that any investors have in fact been injured as a result of such violations. . S.E.C. v. Capital Gains Research Bureau, Inc., supra; Kuehnert v. Texstar Corp., 412 F.2d 700 (5th Cir. 1969).

The deceptive potential of the representations made by the defendants in connection with the sale of said certificates is clear. While the newspaper advertisements and Lundy's letter to prospective investors unconditionally assured them that interest would be paid on said certificates every three (3) months, the certificates (which investors did not receive until after payment therefor) provided:

"The Beneficiaries shall receive from said Trust Estate, *when, as, and if*

---

course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a).

4. Said Section 10(b) of the Securities Exchange Act of 1934 reads as follows:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . .
* * * * *
(b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive devise or contrivance in contravention of such rules and regulations the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

5. Rule 10b–5 promulgated by the Securities and Exchange Commission provides as follows:
"Employment of manipulative and deceitful devices.
It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.
(a) To employ any device, scheme, artifice to defraud,
(b) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*available,*—interest at the rate of 9% per annum payable every three months for nine months—" (Emphasis added)

The possibility of deception of investors is obvious.

Even more misleading is the manner in which the defendants described the alleged relationship between the investor, the trusts and FDP. The letter sent to prospective investors by Lundy assured them that the "certificate note is secured by an assigned first mortgage". Said certificates in fact stated—

"the Beneficiaries have a proportionate interest in said Trust which consists in part of a Promissory Note in an amount which may not exceed $201,000 secured by assigned mortgages on unimproved real property in Osceola County, Florida. . . . "

The content of said letter is manifestly false. At the time of its issuance said certificate note was not in fact secured by any first mortgage. On the contrary, the investors paid their price of the certificates to the trust which issued them. Then the trustee of said trust, Allard, loaned the money at some later date to FDP. It was then that the assignments of particular mortgages selected by her were recorded as security for the payment of said loan. The certificates were inaccurate and misleading in that they did not disclose that FDP had expressly stated in its loan agreement with Allard that said mortgages did not at the time said loan agreement was executed (and at the time the defendants were soliciting investors in said certificates) "all represent good and valid first mortgages". As the certificates were sold, the trustee accumulated the proceeds thereof and periodically thereafter loaned them to FDP.

Finally, both Lundy's letter and said certificates of beneficial interest stated that repayment of the purchase price thereof was guaranteed by FDP's parent corporation, Apollo Industries, Inc. Investors were not advised that said guarantee ran only to the trustee of said

trusts, not to the certificate holders, and that she in her discretion would have to bring a legal action against FDP in order to collect on said guarantee. It was not disclosed to investors that Apollo had no funds specifically segregated for the purpose of guaranteeing the loans by said trusts to its subsidiary FDP. In fact, Lundy admitted that he did not know whether said guarantee ran to all of the trusts whose certificates were sold. Furthermore, investors were not advised of the precarious financial condition of Apollo Industries, Inc.; they were told only that it was a diversified company listed on the American Stock Exchange.

Lundy testified that the sales of said certificates ceased in April, 1972, that the last newspaper advertisement thereof appeared on April 30, 1972, and that no additional certificates have been sold since that date. He also testified that said certificates were renewable after their expiration and that certain of them had been renewed at the request of the holders thereof.

In my opinion the entire sales methods employed by the defendants were such that it was most likely that prospective investors would be mislead. The violations of the anti-fraud provisions of said Acts and Rule are obvious as is the danger which such violations create for the public. In view of the past conduct of the defendants, it must be concluded that a repetition of such conduct in the future is a reasonable likelihood.

Accordingly, a preliminary injunction will issue enjoining said defendants from future violations of said Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and said Rule 10b–5.

## C. *Alleged Violation of Book-Keeping Provisions*

■ The defendants concede that they have failed to maintain proper records in connection with the sales of said certificates of beneficial interest.

It having been determined that they are non-exempt securities and that future violations by them are reasonably probable, a preliminary injunction will issue enjoining the defendants from dealing in non-exempt securities without compliance with the book-keeping rules promulgated by said Securities and Exchange Commission under Section 17(a) of said Securities Exchange Act of 1934, 15 U.S.C. § 78q(a).

## I. *Scotch Whisky Warehouse Receipts*

In the second cause of action, in its complaint, the plaintiff alleges that the defendants Lundy and Scotch Whisky, Ltd. (hereinafter referred to as Limited) have violated and are violating the registration provisions of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (c), and the anti-fraud provisions of Section 17(a) of that Act, 15 U.S.C. § 77q(a); and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, the book-keeping provisions of Section 17(a) of that Act, 15 U.S.C. § 78q(a) and Rules 17a–3 and 17a–4 promulgated thereunder.

Limited is a Rhode Island corporation which is controlled by Lundy. It is the exclusive representative of Angus Macpherson & Co., of London, England, in the sale of scotch whisky warehouse receipts in the United States for a three-year period. In this capacity Limited solicits purchasers through newspaper advertisements which contain such statements as "Invest In Scotch Whisky For Profit"; "Exceptional Capital Growth Is Possible When You Buy Scotch Whisky Reserves By The Barrel"; "Insured (Lloyds of London) No Loss Policy"; and "Insured Investment For Profit And Growth in Scotch Whisky". The minimum cost of said warehouse receipts offered and sold is $1,000.

The evidence establishes that said advertisements by Limited were placed in newspapers published in Rhode Island, Massachusetts and Florida.

Lundy testified that if a prospective investor responds to the advertisements, he is mailed a brochure issued by Macpherson & Co. which describes the investment in scotch whisky warehouse receipts. This brochure states among other things: "The principle of whisky lying in bond in Scotland is that the older the whisky the more the price appreciates"; "Here your whisky increases in value automatically while it gets older"; and "At the same time grain prices fluctuate spasmodically, being the gambling factor in whisky manufacturing; we, therefore, only advise our clients to purchase malt whisky for guaranteed appreciation." Said brochure fails to disclose that the appreciation in the value of scotch whisky is based upon the economic law of supply and demand and that there is no guarantee, as Lundy admitted, of appreciation in value based solely on the aging process of whisky.

The advertisements inserted in newspapers by Limited also misleadingly refer to the availability of insurance to the investor which will protect him from loss. Said advertisements fail to state that the insurance policy referred to will only protect the investor against physical loss or damage to the whisky or casks in which it is contained. The investment is not insured for profit as is recited in the advertisements, nor does the policy protect the investment against all risks. Although the insurance policy is entitled "Lloyds' Whisky All Risks Insurance", the risk is limited to "all risks of physical loss or damage to whisky and or casks".

Lundy testified that an investor who purchased said whisky warehouse receipts could take personal possession of his whisky if he desired to do so. But the evidence presented indicated that the steps required for the taking of physical possession of such whisky represented by said receipts are both difficult and unprofitable.[6]

Although required by the record-keeping provisions of the Securities Ex-

---

6. For example, an investor desiring to take possession of his whisky would have to clear its importation with the Alcohol, Tobacco and Firearms Division of the

change Act of 1934, Lundy admitted that the books and records of Limited did not reflect or record said transactions with respect to the sale of said scotch whisky warehouse receipts.

### A. Alleged Violations of Registration Provisions

The plaintiff contends that Lundy and Limited, in offering said scotch whisky warehouse receipts for sale and selling them are violating the registration provisions of Section 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (c). The defendants maintain that there have been no such violations by them because said scotch whisky warehouse receipts are not "securities" within the meaning and scope of said registration provisions of said Act.[7]

In S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L. Ed. 88 (1943), the Supreme Court held that assignments of certain oil leases were investment contracts and therefore securities within the scope of said Securities Act of 1933. The Supreme Court said at pages 352–353, 64 S.Ct. at page 124:

"The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be."

Later in S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) the Supreme Court held at pages 298–299, 66 S.Ct. at page 1103:

" . . . In other words, an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."

Later in its opinion the Supreme Court restated this standard at page 301, 66 S.Ct. at page 1104 as follows:

" . . . The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value. See S.E.C. v. C. M. Joiner Leasing Corp., supra, 320 U.S. 352 [64 S.Ct. 120, 124, 88 L.Ed. 88]. The statutory policy of

---

Internal Revenue Service, and the United States Customs Service, pay a tax and have the raw, unblended whisky bottled before he could import it. Furthermore, the value of said whisky, as admitted by Lundy, would be substantially reduced when removed from bond. Lundy also admitted that as of the time of the hearing before this Court only one investor had inquired as to the possibility of his taking possession of the whisky represented by his receipt and that no investor had actually taken possession of his whisky for his personal consumption or other disposition thereof.

7. Section 2(1) of said Securities Act of 1933, 15 U.S.C. § 77b(1), provides as follows:

"When used in this subchapter, unless the context otherwise requires—

(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae."

The defendants contend that a purchaser of scotch whisky warehouse receipts is neither involved in a common enterprise nor dependent upon the efforts of others for his profits. In support of this contention they argue that the investor merely purchases a specified number of gallons of raw, unblended whisky and having purchased them that he is then free to hold, sell, deal with or consume said whisky as he sees fit. In making this contention, they ask this Court, in effect, to ignore the realities of the situation and to ignore the inducements set forth in said Macpherson brochure.

In Continental Marketing Corp. v. S. E.C., 387 F.2d 466 (10th Cir. 1967), cert. denied, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968), the Court of Appeals quite properly noted the admonition of the Supreme Court in S.E.C. v. W. J. Howey Co., supra, that courts should disregard form and look to the substance of a transaction, placing emphasis on "economic reality" and held at page 470 of 387 F.2d:

"The more critical factor is the nature of the investor's participation in the enterprise. If it is one of providing capital with the hopes of a favorable return then it begins to take on the appearance of an investment contract notwithstanding the fact that there may be more than one party or other than a principal party and his agent on the other end of the transaction or transactions."

In the instant case it is abundantly clear that "the nature of the investor's participation in the enterprise" is that "of providing capital with the hopes of a favorable return". From the evidence it is also clear that the success of most, if not all, of the investors in said scotch whisky warehouse receipts is dependant upon the advice of the brokers thereof. It must be borne in mind that the purpose of their acquisition is the realiza-tion of a profit on their resale. This is amply demonstrated by said newspaper advertisements and by said Macpherson brochure.

The defendants, in support of their contention that said warehouse receipts are not investment contracts or securities within the registration provisions of said Act, rely on the case of Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc. 253 F.Supp. 359 (S.D.N.Y. 1966). In that case the Court held that contracts to purchase sugar futures were not "investment contracts" as that term is defined in the Securities Act of 1933 and the Securities Exchange Act of 1934. In reaching that conclusion the Court found that said purchases of sugar futures did not involve investments in a "common enterprise" or "reliance upon the efforts of promoters, managers, employees or any third party". 253 F. Supp. at 366–367.

In my opinion a realistic appraisal of the evidence in this case and of the reasonable inferences to be drawn from it dictates the conclusion that said scotch whisky warehouse receipts are securities within the meaning of Section 2(1) of said Securities Act of 1933.

The propriety of the issuance of a preliminary injunction against the defendants Lundy and Limited with respect to future offers and sales of said scotch whisky warehouse receipts is most apparent. The plaintiff has, since 1969, maintained the public position that the sales of such receipts may involve the sale of securities and therefore require compliance by the seller thereof with the registration provisions of said Securities Act. See Securities Release No. 5018, reprinted in C.C.H.Fed.Sec.L. Rep. ¶ 77,757 at 83, 740–742 (1969). No evidence was presented that Lundy or Limited ever made any inquiries of the Securities and Exchange Commission in this regard. In my opinion, the plaintiff has established that there is a clear likelihood of continued and further violations of the registration provisions of said Act by the defendants unless

they are enjoined. Accordingly, a preliminary injunction will issue enjoining the said Lundy and Limited from participating in the offering, sale or distribution of said scotch whisky warehouse receipts until they have complied with the registration requirements of Section 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (c).

B. *Alleged Violation of The Anti-Fraud Provisions*

 The plaintiff also charges Lundy and Limited with having made false and misleading statements concerning said scotch whisky warehouse receipts to investors and with having mislead them by omitting material facts in their representations. It contends that the value of said whisky does not automatically increase with the lapse of time, and that the value of whisky is dependent upon the law of supply and demand. In my opinion this contention is not entirely accurate. The supply of and demand for whisky, of course, affect its price but it is also true that the value of whisky does appreciate as it ages. The extent of the increase in value will largely depend upon supply and demand. It is for this reason that said Macpherson brochure emphasizes the expertize of Macpherson & Co. and the fact that "when we have wind of the market going up, we advise our clients to buy. When the opposite occurs, we advise our clients to sell and re-buy at a lower price - - - -". The brochure emphasizes the growth of the whisky industry and the tremendous rise in the demand for scotch whisky in recent years. The truth of these representations is not challenged by the plaintiff.

The plaintiff also contends that the defendants' use in its newspaper advertisements of the words "Insured Investment For Profit And Growth In Scotch Whisky" and "Insured (Lloyds' of London) No Loss Policy" was deceptive and misleading to prospective investors. The evidence conclusively establishes that the policy of insurance issued by Lloyds covered only losses caused by fire and leakage in the casks in which it was stored. While it is true that said Macpherson brochure made this fact clear, said advertisements would certainly lead the unsophisticated investor who neglected to read said brochure carefully to believe his investment was insured against all losses.

 In my opinion the advertisements used by the defendants in the promotion of the sales of said whisky warehouse receipts were deceptive and misleading, and in violation of the anti-fraud provisions of the Securities Act of 1933, of the Securities Exchange Act of 1934, and of Rule 10b–5 promulgated thereunder.

 A preliminary injunction will issue enjoining said defendants, Lundy and Limited, from future violations of the anti-fraud provisions of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), the anti-fraud provisions of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder.

C. *Alleged Violation of Book-Keeping Provisions Of The Securities Exchange Act of 1934*

 As hereinbefore recited, the defendants Lundy and Limited concede that they have failed to keep and maintain proper books and records relating to the sales by them of said scotch whisky warehouse receipts. Since it is clear that said receipts are securities within the meaning of said Securities Exchange Act, a preliminary injunction will issue forthwith enjoining them and each of them from further violations of Section 17(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q(a) and of the rules promulgated thereunder.

Counsel for the plaintiff will prepare and present for entry an order in conformity with the conclusions hereinbefore set forth.